ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Parte Apelada<br><br>v.<br><br>FERNANDO MANUEL TORRES RUIZ<br><br>Parte Apelante | KLAN202400632 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso Núm.:<br>ISCR202200553<br>ISCR202200554<br>ISCR202200555<br><br>Sobre:<br>Art. 93 (a) C.P. (1er Grado)<br>Art. 5.04 Ley 404<br>Art. 5.15 Ley 404 |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 12 de marzo de 2025.

Compareció ante este Tribunal la parte apelante, el Sr. Fernando Manuel Torres Ruiz (en adelante, el "señor Torres Ruiz" o el "Apelante"), mediante recurso de apelación presentado el 1 de julio de 2024. Nos solicitó la revocación de la *Sentencia* emitida y notificada por el Tribunal de Primera Instancia, Sala Superior de Mayagüez (en adelante, el "TPI"), el 12 de junio de 2024. Mediante dicho dictamen, se encontró culpable al Apelante por violar el Artículo 93 del Código Penal de Puerto Rico, 33 LPRA sec. 5142, y los Artículos 5.04 y 5.15 de la derogada Ley Núm. 404-2000, según enmendada, conocida como la "Ley de Armas de Puerto Rico, 25 LPRA secs. 458d y 458n, respectivamente (en adelante, "Ley de Armas").

Por los fundamentos que expondremos a continuación, se *confirma* la *Sentencia* apelada.

**I.**

Por hechos acontecidos el 8 de enero de 2018, el Ministerio Público presentó el 18 de octubre de 2021 varias denuncias en contra del señor Torres Ruiz por infringir el Artículo 93 del Código Penal de Puerto Rico, *supra*, y los Artículos 5.04 y 5.15 de la Ley de Armas, *supra*, que tipifican los delitos de asesinato en primer grado, portación y uso de armas de fuego sin licencia y disparar o apuntar armas, respectivamente. En síntesis, al Apelante se le imputó dar muerte al joven Edgar Yomar Casiano Caraballo (en adelante, "Casiano Caraballo") mediante acecho, realizándole múltiples disparos con un arma de fuego.

Posteriormente, el 8 de febrero de 2022, se determinó causa probable para su arresto por los delitos previamente mencionados. El 17 de mayo de 2022, se celebró la vista preliminar por los mismos delitos imputados y se determinó causa para acusar. Así las cosas, el Ministerio Público presentó los correspondientes pliegos acusatorios. En específico, la acusación del caso núm. ISCR202200553 lee como sigue:

> El referido acusado FERNANDO MANUEL TORRES RUIZ, allá en o para el día 8 de enero de 2018 y en el Municipio de Mayagüez, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Mayagüez, ilegal, voluntaria, intencional, criminal a propósito y con conocimiento le ocasionó la muerte al ser humano EDGAR YOMAR CASIANO CARABALLO MEDIANTE acecho y con conocimiento, realizándole múltiples disparos con un arma de fuego, Pistola 9 milímetros, en un lugar público o abierto al público, ocasionándole múltiples heridas de balas que provocaron su muerte.

> [...]

> Por su parte, la acusación del caso núm. ISCR202200554 dispone

lo siguiente:

> El referido acusado FERNANDO MANUEL TORRES RUIZ, allá en o para el día 8 de enero de 2018 y en Mayag[ü]ez; Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Mayag[ü]ez, ilegal, voluntaria y criminalmente portaba, transportaba y conducía sobre su persona, un arma de fuego PISTOLA CALIBRE 9 MIL [Í]METROS sin haber obtenido previamente licencia según lo dispuesto por la Ley para la portación o transportación de la misma, expedida por el Tribunal de Primera Instancia ni por la Policía de Puerto Rico, siendo dicha arma de fuego capaz de causar grave daño corporal y hasta la muerte de un ser humano.

En cuanto al caso núm. ISR202200555, la acusación establece lo siguiente:

> El referido FERNANDO MANUEL TORRES RUIZ, allá en o para el día 8 de enero de 2018 y Mayag[ü]ez; Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Mayag[ü]ez, ilegal, voluntaria y criminalmente, apuntó y disparó un arma de fuego (PISTOLA 9 MIL [Í]METROS) en un sitio público o en cualquier otro sitio donde hubo alguna persona que pudo sufrir o sufrió daño. Consistente en que el aquí acusad le apuntó y disparó en varias ocasiones a EDGAR YOMAR CASIANO CARABALLO.

Luego de varios trámites procesales, el juicio en su fondo se celebró por jurado los días 22, 23, 24 y 25 de enero de 2024 y el 21 y 22 de febrero del mismo año. Una vez finalizado el desfile de la prueba, el 12 de junio de 2024 el TPI emitió una *Sentencia* a través de la cual condenó al señor Torres Ruiz a: (1) una pena de noventa y nueve (99) años por infringir el Artículo 93 del Código Penal de Puerto Rico, *supra*, (2) una pena de diez (10) años por infringir el Artículo 5.04 de la Ley de Armas, *supra*, la cual fue duplicada conforme al Artículo 7.03 de dicho estatuto, sumando un total de veinte (20) años, y (3) a una pena de cinco (5) años por infringir el Artículo 5.15 de la Ley de Armas, *supra*, la cual también fue duplicada conforme al antedicho Artículo, resultando en un total de diez (10) años. 25 LPRA sec. 460b, 458c y 458n.

Inconforme con lo anteriormente resuelto, el Apelante acudió ante este Tribunal mediante el recurso de epígrafe, en el que señaló los siguientes errores:

1. **ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD EN TODOS Y CADA UNA DE LAS ACUSACIONES PRESENTADAS, ANTE UNA PRUEBA QUE NO DERROTÓ LA PRESUNCIÓN DE INOCENCIA DE LOS DELITOS MÁS ALLÁ DE DUDA RAZONABLE.**

2. **ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD A PESAR DE QUE LA ÚNICA PRUEBA QUE TUVO ANTE SU CONSIDERACIÓN QUE IDENTIFICARA Y CONECTARA AL ACUSDO CON LOS HECHS DELICTIVOS FUE UNA ALEGADA ADMISIÓN A UN PARTICULAR QUE NO FUE CORROBORADA EN CLARO INCUMPLIMIENTO JURÍDICO.**

3. **ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD**

EN CONTRA DEL AQUÍ APELANTE CUANDO LA PRUEBA DE IDENTIFICACIÓN Y CONEXIÓN DEL ACUSADO CON EL HECHO DELICTIVO DESCANSÓ EN PRUEBA DE REFERENCIA Y EN EL TESTIMONIO MENDAZ DE UN TESTIGO PARCIALIZADO Y CON INTERÉS

4. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR NO DISPONIBLE AL TESTIGO FREDDIE CANCEL AL NO CUMPLIR CON LOS RIGORES QUE MANDATA NUESTRO ORDENAMIENTO JURÍDICO Y AGOTAR LOS REMEDIOS QUE TENÍA EL ESTADO PARA LOGRAR LA DISPONIBILIDAD DE ÉSTE.

5. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR A FREDDIE CANCEL TESTIGO NO DISPONIBLE CUANDO FUE EL ESTADO Y EL MINISTERIO PÚBLICO QUIEN PROVOCÓ SU NO DISPONIBILIDAD.

6. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NEGARSE A CELEBRAR UNA VISTA DE REGLA 109 DE EVIDENCIA SOBRE EL TESTIMONIO ANTERIOR DE FREDDIE CANCEL EN VISTA PRELIMINAR Y DE ESTA MANERA EVITAR QUE PRUEBA INADMISIBLE PASARA A LAS DAMAS Y CABALLEROS DEL JURADO.

7. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL PERMITIR SUSTITUIR EL TESTIMONIO DE FREDDIE CANCEL EN JUICIO CON EL PRESTADO EN VISTA PRELIMINAR EN DONDE LAS GARANTÍAS PROCESALES Y EL DERECHO A LA CONFRONTACIÓN NO OPERAN COMO EN EL JUICIO.

8. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL PERMITIR QUE PASARA AL JURADO TESTIMONIOS EN DONDE EL TESTIGO DECLARANTE NO OSTENTABA CONOCIMIENTO PERSONAL

9. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL PERMITIR QUE PASARA PRUEBA AL JURADO DE ARRESTOS Y CONVICCONES ANTERIORES DEL ACUSADO, A PESAR DE QUE ELLO CLARAMENTE INADMISIBLE E INFLAMATORIO.

10. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL PERMITIR QUE EL MINISTERIO PÚBLICO EN SU INFORME FINAL ARGUMENTAR ASUNTOS QUE NO FUERON PARTE DE LA PRUEBA DESFILADA Y COMENTARA CONVICCIONES ANTERIORES DE ACUSADO EN CLARA VIOLACIÓN AL DERECHO A UN JUICIO JUSTO E IMPARCIAL.

11. ERRÓ EL TPI AL DECLARAR NO HA LUGAR LA PETICIÓN DE ABSOLUCIÓN PERENTORIA SOLICITADA POR LA DEFENSA.

El 10 de marzo de 2025, compareció el Estado por conducto de la Oficina del Procurador General mediante "**Alegato de El Pueblo de Puerto Rico**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II.

## A.

El Código Penal de Puerto Rico fue promulgado como una medida para prevenir, regular y disminuir la frecuencia de conductas delictivas como el delito de asesinato. Así, el Artículo 92 de dicha legislación define el referido delito como la acción u omisión de dar muerte a un ser humano ya sea a propósito, con conocimiento o temerariamente. 33 LPRA sec. 5141. Es menester destacar que la Ley Núm. 246-2014 reemplazó la palabra "premeditación" en el delito de asesinato por las palabras a "propósito" o "con conocimiento". D. Nevares-Muñiz, Código Penal de Puerto Rico Comentado, 4ta ed. rev., San Juan, Instituto para el Desarrollo del Derecho, Inc., 2019, pág. 153. Así pues, en la tipificación del delito de asesinato se engloban todas aquellas modalidades en las que exista la intención de matar. Pueblo v. Roche, 195 DPR 791, 797 (2016). Es decir, el término intención es sinónimo de actuar a propósito, con conocimiento o temerariamente. 33 LPRA sec. 5014.

Una persona actúa a propósito con relación a un resultado o circunstancia cuando su objetivo consciente es la producción de dicho resultado o cuando cree que la circunstancia existe. 33 LPRA sec. 5035. Ésta actúa con conocimiento cuando está consciente de que la producción del resultado o la existencia de la circunstancia es prácticamente segura. Íd. En cambio, actúa temerariamente cuando está consciente de que su conducta genera un riesgo sustancial e injustificado de que se produzca el resultado prohibido por ley. Íd.

El elemento subjetivo de la conducta delictiva constituye una cuestión de hechos a ser evaluada por el juez o el jurado, según sea el

caso. D. Nevares-Muñiz, Derecho Penal Puertorriqueño, 7ma ed. rev. San Juan, Instituto para el Desarrollo del Derecho, Inc., 2019, pág. 193. Este "se manifiesta por las circunstancias relacionadas con el hecho, la capacidad mental, las manifestaciones y conducta de la persona". 33 LPRA sec. 5034. O sea, la intención se presume por la forma en que se lleva a cabo la acción ilegal con el designio de perjudicar a otro. Pueblo v. Negrón Ayala, 171 DPR 406, 420 (2007). En la mayoría de los casos, la intención específica de matar solo puede ser determinada mediante una inferencia razonable de los hechos. Pueblo v. Rodríguez Pagan, 182 DPR 239, 250 (2011). Así pues, para probar los elementos subjetivos del delito es necesario analizar los acontecimientos previos, simultáneos y posteriores al crimen. Pueblo v. Rosario, 160 DPR 592, 611 (2003). Esto se debe a que, a través de las circunstancias retrospectivas, concomitantes y prospectivas podemos determinar si la persona actuó a propósito, con conocimiento o temerariamente. Nevares-Muñiz, *op. cit.*, pág. 193.

Finalmente, nuestro sistema legal divide el delito de asesinato en dos grados, según la perversidad demostrada por el acusado al cometer el acto y con el único objetivo de determinar la pena a imponer. Pueblo v. Negrón Ayala, *supra*, pág. 418. Cónsono con lo anterior, el Artículo 93 del Código Penal detalla las modalidades que constituyen asesinato en primer grado y las que se clasifican como segundo grado. 33 LPRA sec. 5142. En lo aquí pertinente, se considera asesinato en primer grado aquel "perpetrado por medio de veneno, acecho, tortura o a propósito o con conocimiento." Íd. Esta modalidad tomó el lugar de la modalidad de asesinato deliberado del Código Penal del 1902 y 1974 y premeditado del Código del 2004. Nevares-Muñiz, *op. cit.*, pág. 155.

**B.**

La derogada Ley de Armas, *supra*, fue promulgada con el objetivo de establecer medidas de control de armas para "promover una mayor seguridad y bienestar público para el Pueblo de Puerto Rico." *Véase*, exposición de motivos de la Ley de Armas, *supra*. Con este propósito,

dictaba disposiciones para regular la posesión y el uso de armas, así como la tenencia y el uso de municiones. Íd. Además, advertía a los ciudadanos sobre las graves consecuencias de cometer actos criminales con armas de fuego. Íd.

En lo aquí concerniente, el Artículo 5.04 de la referida ley regulaba la portación y uso de armas de fuego sin licencia. 25 LPRA sec. 458c. Este disponía que toda persona que portara o transportara cualquier arma de fuego sin tener una licencia de armas incurriría en delito grave y sería sancionada con una pena de reclusión por un término fijo de diez (10) años, sin derecho a sentencia suspendida ni a libertad bajo palabra. Íd. Además, indicaba que, si existían circunstancias agravantes, la pena podía ser aumentada hasta un máximo de veinte (20) años. Íd. Por otro lado, el Artículo 5.15 establecía que toda persona que voluntariamente disparara cualquier arma en un sitio público o intencionalmente apuntara hacia alguna persona con un arma incurriría en delito grave y sería sancionada con una pena de reclusión por un término fijo de cinco (5) años. 25 LPRA sec. 458n. Asimismo, establecía que, si mediaban circunstancias agravantes, la pena podía ser aumentada hasta un máximo de diez (10) años. Íd. Este delito excluía los casos en que aplicara la doctrina de legítima defensa o cuando se tratara de actuaciones en el desempeño de funciones oficiales o de actividades legítimas de deportes. Íd.

Entre las circunstancias agravantes se encuentran las siguientes, a saber: (1) cuando el convicto tiene historial delictivo que no se consideró para imputar reincidencia, (2) cuando el convicto cometió el delito mientras disfrutaba de los beneficios de sentencia suspendida, libertad bajo palabra, restricción domiciliaria, libertad provisional bajo fianza o en un programa de desvío, (3) cuando el convicto causó grave daño corporal a la víctima o empleó amenaza de causárselo o (4) el delito cometido fue de violencia y revela crueldad y desprecio hacia la víctima. 33 LPRA sec. 5099. Por último, el Artículo 7.03 de la entonces vigente Ley de Armas, *supra*, establecía que cuando una persona utilizara un arma en la comisión de

cualquier delito y como resultado de tal violación otra persona sufría un daño físico o mental, la pena establecida debía duplicarse. 25 LPRA sec. 460b.

**C.**

Es norma sólidamente establecida en nuestra jurisdicción que no se favorece la intervención de los tribunales apelativos al momento de revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formulados por el Tribunal de Primera Instancia en ausencia de pasión, prejuicio, parcialidad o error manifiesto. Pueblo v. Negrón Ramírez, 213 DPR ___ (2024), 2024 TSPR 41; Pueblo v. Hernández Doble, 210 DPR 850, 864 (2022). Por tal razón, se les concede gran deferencia a las determinaciones de hechos realizadas por los juzgadores de instancia, así como a las adjudicaciones de credibilidad que éstos hacen sobre los testigos que declaran ante ellos. Pueblo v. Negrón Ramírez, *supra*, pág. 18. Esto responde al hecho de que son el Juez y el Jurado los que están en mejor posición para aquilatar la prueba testifical al tener la oportunidad de oír, ver y apreciar el comportamiento de los testigos. Íd., pág. 16; Pueblo v. Hernández Doble, *supra*, pág. 864. Esto adquiere mayor relevancia cuando se trata de la prueba oral desfilada en el juicio. Pueblo v. Negrón Ramírez, *supra*, págs. 16-17. Además, "[e]l veredicto del Jurado, como la sentencia del [J]uez, es un acto investido con la alta dignidad de la magistratura en la función juzgadora de la conducta de los hombres, y no es para echarse a un lado con liviandad e indiferencia". Pueblo v. Figueroa Rosa, 112 DPR 154, 159 (1992).

Ahora bien, se ha reconocido que a pesar de la deferencia que merece la determinación apelada, la misma podría ser revocada si: (1) se demuestra que hubo pasión, prejuicio o parcialidad y/o si se incurre en error manifiesto o (2) si la prueba no concuerda con la realidad fáctica, es increíble o imposible. Pueblo v. Santiago, 176 DPR 133, 148 (2009). Es decir, los tribunales apelativos tienen la potestad de sustituir el criterio de los tribunales de instancia en aquellas ocasiones en que, "a la luz de la

prueba admitida, no exista base suficiente que apoye su determinación". Pueblo v. Hernández Doble, *supra*, pág. 865.

Nuestro más alto foro ha definido pasión, perjuicio o parcialidad como "aquellas inclinaciones personales de tal intensidad que llevan a un juzgador a actuar movido por éstas y a adoptar posiciones, preferencias o rechazos con respecto a las partes o sus causas, sin admitir cuestionamientos sobre las mismas y sin importar la prueba que se haya presentado en el juicio". Pueblo v. Negrón Ramírez, *supra*, pág. 19. Por otro lado, han expresado que "las conclusiones del tribunal se considerarán claramente erróneas si un análisis de la totalidad de la evidencia recibida revela que las conclusiones están en conflicto con el balance más racional, justiciero y jurídico". Pueblo v. Hernández Doble, *supra*, pág. 865.

**D.**

En nuestro ordenamiento jurídico, la presunción de inocencia representa uno de los derechos más significativos y fundamentales para quienes enfrentan acusaciones criminales. Esta presunción se encuentra consagrada en el Artículo II, Sección 11 de la Constitución de Puerto Rico, la cual dispone que, en todos los procesos criminales, "el acusado disfrutará del derecho a gozar de la presunción de inocencia". Const. PR, Art. II, Sec. 11, 1 LPRA. En sintonía con ello, nuestras Reglas de Procedimiento Criminal establecen que en cualquier proceso criminal se considerará inocente al acusado hasta que demuestre lo contrario y si hay dudas razonables sobre su culpabilidad, será absuelto. 34 LPRA Ap. II, R. 110. Así pues, la presunción de inocencia es un componente esencial del debido proceso de ley. Pueblo v. Irizarry, 156 DPR 780, 786 (2002).

Dada la robustez de la presunción de inocencia, el acusado puede confiar en ella sin la necesidad de proporcionar pruebas para su defensa. Íd., pág. 787. Esto es, le corresponde al Estado presentar evidencia y cumplir con la carga probatoria para demostrar, más allá de duda razonable, todos los elementos del delito, la intención criminal y la vinculación de la persona acusada con los hechos. Pueblo v. Negrón

Ramírez, s*upra*, págs. 12-13; Pueblo v. Santiago *et al.*, 176 DPR 133, 142 (2009). Además, no solo es necesario que el Estado presente pruebas relacionadas con los elementos del delito imputado, sino que éstas deben ser suficientes y satisfactorias. Pueblo v. Negrón Ramírez, *supra*, pág. 13; Pueblo v. Irizarry, *supra*, pág. 787. Es decir, deben producir "certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". Pueblo v. Negrón Ramírez, *supra*, pág. 13. Por ende, la falta de evidencia sobre alguno de los elementos del delito significaría que el Estado no ha cumplido con su carga probatoria, lo que resultaría en la absolución del acusado en relación con el delito que se le imputa. Íd.

No obstante, para rebatir esta presunción no es necesario alcanzar certeza matemática, sino que basta la certeza moral obtenida mediante un análisis racional. Pueblo v. Rosario Reyes, 138 DPR 591, 598 (1995). En otras palabras, no es necesario eliminar toda duda posible sino vencer todas las dudas basadas en el razonamiento de todos los elementos de juicio envueltos en el caso, evitando las que sean meramente especulativas o imaginarias. Pueblo v. Negrón Ramírez, *supra*, pág. 13. Finalmente, la duda razonable que acarrea la absolución es aquella que se produce de una consideración justa, imparcial y serena de la totalidad de la evidencia del caso. Pueblo v. García Colón I, 182 DPR 129, 175 (2011). De manera que, la duda realmente justificada se reduce a la insatisfacción o inquietud de la conciencia del juzgador con la prueba provista. Pueblo v. Irizarry, *supra*, pág. 788.

**E.**

Las Reglas de Evidencia definen prueba de referencia como "una declaración aparte de la que hace el declarante al declarar en el juicio o vista para probar la verdad de lo aseverado". 32 LPRA Ap. VI, R. 801; *véase*, Toledo Maldonado v. Cartagena Ortiz, 132 DPR 249, 257 (1992). La prueba de referencia no es admisible, salvo que por ley se disponga otra cosa. 32 LPRA Ap. VI, R. 804. Esta norma general de exclusión de la prueba de referencia está fundada en razones de falta de

confiabilidad. Una declaración constitutiva de prueba de referencia presenta cuatro áreas de riesgo, a saber: (1) narración del evento (debe presumirse que el lenguaje utilizado refleja fielmente la percepción del declarante), (2) percepción del evento (debe presumirse que el evento ha sido claramente percibido y correctamente interpretado); (3) recuerdo del evento (debe presumirse que la memoria del declarante es fiel a lo observado); y (4) sinceridad del declarante (debe presumirse que el declarante desea decir la verdad). Toledo Maldonado v. Cartagena Ortiz, *supra*, pág. 259; *véase*, *además*, Nieves López v. Rexach Bonet, 124 DPR 427, 433 (1989).

Esta regla de exclusión está esencialmente fundada en el hecho de que la misma no ofrece garantías circunstanciales de confiabilidad y exactitud. P.N.P. v. Rodríguez Estrada, 123 DPR 1, 34 (1988). El profesor Chiesa señala que la razón que motiva la regla general de exclusión de prueba de referencia es la falta de confiabilidad de la misma y su dudoso valor probatorio, puesto que de ordinario una declaración que constituye prueba de referencia no tiene las garantías de confiabilidad que se produce mediante un testimonio en corte. Un testimonio en corte se hace bajo juramento, frente a la parte perjudicada por la declaración, frente al juzgador que ha de aquilatar su valor probatorio y está sujeta al contrainterrogatorio de las partes que tengan a bien hacerlo. E. L. Chiesa, Tratado de Derecho Probatorio (Reglas de Evidencia de Puerto Rico y Federales, República Dominicana, Pubs. J.T.S., Tomo II, págs. 616 y 617.

No obstante, esta regla de exclusión no es absoluta. Nuestro derecho probatorio incorpora excepciones que han sido establecidas a base de razones circunstanciales que abonan a la confiabilidad o probabilidad de veracidad, así como por razones de necesidad. *Véanse*, 32 LPRA Ap. VI, RR. 802-807. En lo pertinente al caso de autos, la Regla 806 de Evidencia dispone aquellas excepciones que están condicionadas a que el declarante sea un testigo no disponible. 32 LPRA Ap. VI, R. 806.

Cuando se pretende utilizar prueba de referencia contra un acusado, se activa la protección constitucional del derecho a confrontación consagrado tanto en la Enmienda Sexta de la Constitución de los Estados Unidos de América, como en la Sección 11 de nuestra Constitución.[1] Dicha protección constitucional no sólo garantiza el derecho al careo, sino que también implica que cierta prueba de referencia, si es testimonial, será excluida a pesar de proceder bajo alguna de las excepciones a la regla de exclusión codificadas en las Reglas de Evidencia. Crawford v. Washington, 541 US 36 (2004), Pueblo v. Guerrido López, 179 DPR 950, 967 (2010).

El derecho a la confrontación recoge el principio fundamental de que se ponga al acusado en posición de poder enfrentar a sus acusadores. Pueblo v. Cruz Rosario, 204 DPR 1040, 1048 (2020). Este derecho tiene tres (3) vertientes procesales, a saber: (1) el derecho al careo o confrontación cara a cara con los testigos adversos; (2) el derecho a contrainterrogar; y (3) el derecho a excluir la prueba de referencia que intente presentar el Ministerio Público. Pueblo v. Pérez Santos, 195 DPR 262, 269-270 (2016).

Según mencionáramos anteriormente, la Regla 806 de Evidencia codifica una serie de excepciones a la regla general de exclusión de la prueba de referencia, condicionadas a la no disponibilidad del testigo o declarante. A esos efectos, dicha Regla dispone lo siguiente:

No disponibilidad de la persona testigo

(a) *Definición; no disponible como testigo.* – Incluye situaciones en que la persona declarante:

(1) Está exenta de testificar por una determinación del Tribunal por razón de un privilegio reconocido en estas Reglas en relación con el asunto u objeto de su declaración;

(2) **insiste en no testificar en relación con el asunto u objeto de su declaración a pesar de una orden del Tribunal para que lo haga;**

(3) testifica que no puede recordar sobre el asunto u objeto de su declaración;

(4) al momento del juicio o vista, ha fallecido o está imposibilitada de comparecer a testificar por razón de enfermedad o impedimento mental o físico; o

---

[1] *Véase*, 1 LPRA Emda. Art. VI, Constitución de los EE.UU.A.; 1 LPRA Art. II, Sec. 11, Constitución P.R.

(5) está ausente de la vista y quien propone la declaración ha desplegado diligencia para conseguir su comparecencia mediante citación del Tribunal.

No se entenderá que una persona declarante está no disponible como testigo si ello ha sido motivado por la gestión o conducta de quien propone la declaración con el propósito de evitar que la persona declarante comparezca o testifique.

(b)    Cuando la persona declarante no está disponible como testigo, es admisible como excepción a la regla general de exclusión de prueba de referencia lo siguiente:

(1)    *Testimonio anterior.* –Testimonio dado como testigo en otra vista del mismo u otro procedimiento, en una deposición tomada conforme a Derecho durante el mismo u otro procedimiento. Ello si la parte contra quien se ofrece ahora el testimonio – o un predecesor en interés si se trata de una acción o procedimiento civil – tuvo la oportunidad y motivo similar para desarrollar el testimonio en interrogatorio directo, contrainterrogatorio o en redirecto.

(2)    *Declaración en peligro de muerte.* –Una declaración hecha por una persona declarante mientras creía estar en peligro de muerte inminente si la declaración se relaciona con la causa o las circunstancias de lo que creyó era su muerte inminente.

(3)    *Declaraciones contra interés.* –Una declaración que al momento de ser hecha era tan contraria al interés pecuniario o propietario de la persona declarante o le sometía a riesgo de responsabilidad civil o criminal, o tendía de tal modo a desvirtuar una reclamación suya contra otra persona, o creaba tal riesgo de convertirla en objeto de odio, ridículo o desgracia social en la comunidad, que una persona razonable en su situación no hubiera hecho la declaración a menos que la creyera cierta.

(4)    *Declaraciones sobre historial personal o familiar.*–

(A)    Una declaración sobre el nacimiento, adopción, matrimonio, divorcio, filiación, parentesco por consanguinidad o afinidad, raza, linaje u otro hecho similar de historial familiar o personal de la misma persona declarante, aunque ésta no tuviera medios de adquirir conocimiento personal del asunto declarado.

(B)    Una declaración sobre la materia señalada en el párrafo (A) y de otra persona incluyendo la muerte de ésta si dicha persona está relacionada con la persona declarante por parentesco de consanguinidad, afinidad o adopción o existe una relación tal entre la persona declarante y la familia de la otra persona que hiciera probable que dicha persona declarante tuviera

información precisa referente al asunto declarado. 32 LPRA Ap. VI, R. 806 (énfasis suplido y en el original).

De una lectura de la citada Regla, podemos colegir que antes de dar paso a la admisión de prueba de referencia por algunas de las excepciones allí establecidas, el Tribunal debe hacer una determinación de que el testigo o declarante no está disponible para testificar por algunas de las situaciones recogidas en los incisos (a)(1), (a)(2), (a)(3), (a)(4) o (a)(5). Íd. Luego de que se haya hecho la determinación de que el testigo no está disponible, se puede admitir la prueba de referencia bajo alguna de las excepciones contenidas en los incisos (b)(1), (b)(2), (b)(3) o (b)(4). Íd. En otras palabras, la indisponibilidad del testigo es un requisito constitucional, al amparo de la Enmienda Sexta de la Constitución de los Estados Unidos y de la Sección 11 de nuestra Constitución, para admitir un testimonio anterior contra el acusado. Chiesa Aponte*, op cit.,* pág. 730*.*

**G.**

Como norma general, la existencia de un error en la admisión o exclusión de evidencia no implica la revocación de la resolución o sentencia impugnada. Pueblo v. Santos Santos, 185 DPR 709, 727 (2012). Específicamente, el inciso (a) de la Regla 105 de las de Evidencia, 32 LPRA Ap VI, R. 105, dispone que no se dejará sin efecto una determinación errónea respecto a la admisión o exclusión de cierta evidencia, ni se revocará sentencia o decisión alguna, salvo que: (1) la parte perjudicada por la admisión o exclusión de la evidencia haya cumplido con los requisitos de objeción, fundamento u oferta de prueba establecidos en la Regla 104 de Evidencia y (2) el tribunal que considera el señalamiento de error estime que la evidencia admitida o excluida fue un factor decisivo o sustancial en la sentencia emitida o decisión cuya revocación se solicita.

Este segundo requisito considera el impacto del error en el resultado al que arribó el juzgador, ya que, a pesar de que se ha cometido un error en la interpretación o aplicación del derecho probatorio, el tribunal revisor podría concluir que dicho error no influyó de manera significativa en el resultado del caso, permitiendo así la confirmación del dictamen

impugnado, al tratarse de un error judicial de carácter no perjudicial o, en otras palabras, de un *harmless error*. Pueblo v. Santos Santos, *supra*, pág. 728.

En tales casos, le corresponde al tribunal apelativo evaluar si, en ausencia del error cometido, el resultado más probable habría sido el mismo. Íd. (citando a E.L. Chiesa Aponte, Reglas de Evidencia de Puerto Rico, San Juan, Pubs. J.T.S., 2009, pág. 88). Si el tribunal llegara a la conclusión de que efectivamente fue así, correspondería confirmar la sentencia condenatoria; en caso contrario, procederá revocarla. Íd. En cambio, cuando se vulnera un derecho constitucional del acusado aplica el estándar de error constitucional no perjudicial o *harmless constitutional error,* y el dictamen solo se confirma si el foro revisor está seguro, más allá de duda razonable, de que el resultado habría sido el mismo sin el error. Pueblo v. Santiago Irizarry, 198 DPR 35, 45 (2017).

A pesar de lo expuesto, no todos los errores surgidos en el proceso judicial se rigen por la doctrina de error no perjudicial. Por el contrario, el error estructural se caracteriza por ser de tal gravedad que compromete de forma irreparable el sistema adversativo o el juicio imparcial, lo que obliga a la revocación automática de la sentencia impugnada, sin importar las demás pruebas presentadas por el Estado. Pueblo v. Santos Santos, *supra*, pág. 728.

**H.**

La absolución perentoria es una prerrogativa del tribunal que le permite examinar la suficiencia de la prueba de cargo y, a partir de dicho análisis, declarar la no culpabilidad del acusado. Pueblo v. Colón, Castillo, 140 DPR 564, 576 (1996). Aunque esta facultad aplica tanto en juicios por tribunal de derecho como en aquellos ante jurado, su objetivo primordial es impedir que un jurado emita un veredicto condenatorio cuando la prueba es insuficiente. Íd. La Regla 135 de Procedimiento Criminal, 34 LPRA Ap. II, R. 135, habilita esta función judicial al disponer que el tribunal, a *motu proprio* o a solicitud de parte, puede detener el procedimiento o incluso

revocar el veredicto emitido por el jurado si la evidencia presentada carece de la suficiencia necesaria para justificar la convicción. Pueblo v. Rivera Ortiz, 150 DPR 457, 462 (2000).

Específicamente, la Regla 135 de Procedimiento Criminal, *supra*, establece lo siguiente:

> Queda abolida la moción para que se ordene un veredicto absolutorio. El tribunal a instancia propia o a instancia de un acusado decretará su absolución perentoria en uno o varios cargos de la acusación o denuncia luego de practicada la prueba de una o de ambas partes si la misma fuere insuficiente para sostener una convicción por ese cargo o cargos. De presentarse una moción de absolución perentoria, luego de practicada toda la prueba, el tribunal podrá reservarse su resolución, someter el caso al jurado y resolver la moción, bien antes del veredicto o después del veredicto o de disolverse el jurado sin rendir veredicto. Si el tribunal declarare sin lugar la moción antes de rendirse un veredicto de culpabilidad o de disolverse el jurado sin veredicto, la moción podrá reproducirse dentro del término jurisdiccional de los cinco (5) días de rendido el veredicto o disuelto el jurado, siempre que no se hubiere dictado sentencia. 34 LPRA Ap. II. R. 135.

En otras palabras, la absolución perentoria tiene como finalidad prevenir que un ciudadano sea hallado culpable de un delito sin cumplir con el nivel de exigencia que establece nuestro ordenamiento jurídico, cuando el tribunal concluye que la evidencia provista no es suficiente para disipar las dudas razonables que una persona prudente y razonable tendría acerca de la culpabilidad del acusado. Pueblo V. Colon, Castillo, *supra*, pág. 577.

**I.**

La Regla 136 de las de Procedimiento Criminal es la disposición dirigida a regular los informes al jurado. Esta dispone lo siguiente:

> Terminada la prueba, las partes harán sus informes comenzando con el del fiscal, quien podrá además cerrar brevemente el debate, limitándose a rectificar el informe del acusado. El tribunal podrá en el ejercicio de su sana discreción limitar la duración y el número de los informes. 34 LPRA Ap. II, R. 136.

El Tribunal Supremo de Puerto Rico ha establecido que el propósito de los informes finales es llamar la atención del jurado sobre aquellas inferencias que puedan derivarse de la evidencia testifical y documental presentada en el juicio pues, es al jurado al que le compete dirimir las controversias de hecho. Pueblo v. Fournier, 80 DPR 390, 407 (1958). Así

pues, en cuanto al contenido de los informes, tanto el fiscal como la defensa pueden comentar sobre la evidencia presentada y tienen amplia libertad para elaborar conclusiones, inferencias, deducciones y argumentos que se deriven de ella, aun cuando "sean improbables, ilógicos, erróneos o absurdos". Íd., págs. 407-408; Pueblo v. Suárez Fernández,116 DPR 842, 851 (1986).

Dentro de esas normas, el fiscal –al igual que el abogado de la defensa– cuenta con una libertad considerable al formular su discurso ante el jurado. Tanto el Ministerio Público como la defensa pueden usar "imágenes oratorias, literarias o poéticas y hasta ciertas vituperaciones" ya que éstas no constituyen necesariamente conducta impropia. Pueblo v. Fournier, *supra*, pág. 408. Sin embargo, esa libertad muy amplia del argumento no puede degenerar en conducta abusiva. Íd.

Por otra parte, se ha aclarado que, durante el informe al jurado, no es lícito hacer referencia a prueba que no fue admitida en el juicio, así como urgir al jurado a que haga inferencias sin base en la prueba admitida. Íd. Asimismo, existen ciertas limitaciones en cuanto a los argumentos que sí son lícitos. Entiéndase, no se debe inflamar o excitar las pasiones o prejuicios del jurado: (1) haciendo referencia a evidencia inadmisible; (2) urgiéndole que haga inferencias sin base en la prueba admitida; (3) pidiéndole que descarte la evidencia admitida y que funde su veredicto en consideraciones irrelevantes; (4) pidiéndole que no pese la evidencia como prescribe la ley; (5) invocando prejuicios raciales o económicos en contra del acusado; o (6) haciendo referencia al hecho de que el acusado se negó a testificar. Íd.

Ahora bien, ante la posibilidad de que el representante del Ministerio Público haya realizado manifestaciones impropias en su discurso, "**no procede una revocación a menos que se pruebe que oca[s]ionaron perjuicio a los derechos sustanciales del acusado, es decir, que el**

**veredicto fue influenciado por esa conducta impropia**".[2] Íd., págs. 408-409 (énfasis suplido). A ese respecto, **el juez que preside el proceso cuenta con una amplia discreción**, **que sólo debe alterarse si se demuestra que abusó de la misma.** Esto debido a que es él quien "conoce la atmósfera del juicio, oye el énfasis del comentario, aprecia la susceptibilidad de los jurados y el grado de atención que le prestan a esta o a aquella parte del argumento". Íd., pág. 408.

**III**.

En el presente caso, el señor Torres Ruiz nos solicitó la revocación de la *Sentencia* del TPI mediante la cual fue declarado culpable de los siguientes delitos: (1) asesinato en primer grado, (2) portación y uso de armas de fuego sin licencia y (3) disparar o apuntar armas.

Comenzaremos por discutir los señalamientos de error del cuatro (4) al ocho (8), ya que la disposición de ellos afecta el resultado del restante de los errores planteados. Dado su estrecha relación, se tratarán de forma conjunta durante la discusión. Específicamente, el Apelante sostiene que el TPI erró al declarar no disponible al señor Cancel González cuando fue el propio Ministerio Público quien provocó su no disponibilidad y al permitir sustituir su testimonio en juicio con el prestado durante la vista preliminar. Asimismo, agregó que el TPI se equivocó al negarse a celebrar una vista al amparo de la Regla 109 de las de Evidencia, 32 LPRA Ap. VI, R. 109, sobre el testimonio anterior del señor Cancel González. No nos convence su postura. Veamos.

Surge del expediente ante nuestra consideración que el señor Cancel González testificó en contra del Apelante en la vista preliminar celebrada el 17 de mayo de 2022. No obstante lo anterior, este se negó a declarar el 23 de enero de 2024, durante el juicio, ya que no llegó a un

---

[2] *Véase,* además, Pueblo v. Dones Arroyo, 106 DPR 303 (1977), nota al calce núm. 1. ("Informes al jurado dentro de los límites establecidos en Fournier, *supra*, no constituyen error revocable debido a que no es lógico suponer que los jurados sean personas de sensibilidad tan extrema que cualquier expresión o incidente, […] les afecte el ánimo de tal forma que les impida rendir un veredicto imparcial".)

acuerdo con el Ministerio Público y tampoco se sentía cómodo haciéndolo.

Específicamente, expresó lo siguiente:

> R No voy a declarar, tenía conocimiento de eso no se por que me siguieron bajando, ustedes saben que yo no voy a declarar y yo no quiero seguir bajando pa' eso.[3]
>
> […]
>
> P Usted ha expresado para el récord que usted no desea declarar. ¿Ah?
> R No.
> P "No". ¿Por qué usted no…? ¿Por qué usted se niega a declarar?
> R **Primero fue… Ya le dije una vez, y mi acuerdo se rompió. Yo no voy a hacer esto si no hay acuerdo, eso es lo primero. Y lo segundo es que ya no quiero hacerlo, no me siento cómodo haciéndolo.**[4]

Como consecuencia de ello, el Ministerio Público le solicitó al Tribunal que declarara al señor Cancel González como testigo no disponible y admitiera en evidencia el testimonio que este proveyó en la vista preliminar del 17 de mayo de 2022. El Juez que presidió los procedimientos declaró "Ha Lugar" dichas solicitudes. En detalle, las partes expresaron lo siguiente:

> P Mire. Y… Juez, el proceso sería solicitarle a usted que le ordene que declare, pero habiendo, verdad, ya él expresado que no quiere declarar, la súplica a Su Señoría es que, determine como testigo no disponible, él… Y una vez el Tribunal lo determine como testigo no disponible, pues, tendríamos que hacerle otra petición al Tribunal.[5]
> Honorable Juez:
> Defensa.
>
> LCDO. RAFAEL RAMÍREZ VALENTÍN
>
> **No, no, está bien. Está haciendo el planteamiento el compañero que corresponde en derecho.**
>
> FISCAL JOSÉ H. AROCHO SOTO
>
> Mire, Testigo, aunque el Juez le ordene que declare, ¿Cuál sería su posición?
>
> TESTIGO, SR. FREDDIE CANCEL GONZÁLEZ:
>
> Seriamente, no me quiero buscar un desacato seis meses más. Pero no me siento seguro, o sea, no me siento cómodo haciéndolo. No espero hacerlo, es algo que no va a salir de mí. Sinceramente no quiero

---

[3] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 87.
[4] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 88 (énfasis suplido).
[5] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 88.

hacerlo ya. Que lo que yo informe, yo le mande información a mi abogado para que supieran que no siguieran bajando, porque en verdad no quiero seguir buscando desacato, porque ya me busqué un desacato. Y no quiero seguir con seis meses, seis meses, seis meses, porque son tiempo que voy a perder en una cárcel.[6]

HONORABLE JUEZ

Pero tenemos que estar claro que quien inició la cadena de la maquinaria sobre usted declarar fue usted mismo.[7]

TESTIGO, SR. FREDDIE CANCEL GONZÁLEZ:

Sí.

HONORABLE JUEZ:

Porque a usted nadie lo obligó a prestar estos testimonios.

TESTIGO, SR. FREDDIE CANCEL GONZÁLEZ:

Yo me acuerdo que, sinceramente no se estaban llevando a cabo como se tenía que llevar y es algo, como todo, que no, que no…yo no voy a declarar para no beneficiarme yo. Y decidí, declarar más nada, porque el abogado, que el acuerdo, lo que yo creí en el acuerdo no me lo querían dar. Y es como todo, yo iba a declarar por un acuerdo que tenía.[8]

HONORABLE JUEZ:

Y yo…Ante esta situación, independientemente, tengo que imponer el desacato. Pero la realidad es que por más que…es el desacato por incumplimiento con la orden de declarar, punto. Aquí no aplica el desacato civil, yo no lo voy a volver porque no hay ningún, ningún efecto en yo guardarlo civilmente para forzarlo.[9]

FISCAL JOSÉ H. AROCHO SOTO:

Fíjese, Su señoría, que yo por eso es que yo le hago esas preguntas adicionales, porque estoy consciente que ya el declaró en un proceso en el que yo fui el Fiscal…. Y si declaró luego en dos procesos en los que yo no fui el Fiscal, la realidad es que yo no había vuelto hablar con el señor Freddie Cancel González. Yo desconocía si iba a declarar o no iba a declarar en el día de hoy. Yo no podía tener una idea, pero, ¿Qué iba a pasar a ciencia cierta?, pues, lo desconocía. Yo no le solicito al Tribunal que le ordene que declare, porque estoy consciente de las consecuencias que eso tiene para el propio Freddie Cancel González. Por

---

[6] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 89 (énfasis suplido).

[7] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 89.

[8] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 90.

[9] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 90.

eso, la pregunta que le hago es, si el Tribunal le ordenara a usted, que es una pregunta hasta cierto punto hipotética, verdad, que declarara cuál sería su posición para evitar exponerlo a un desacato adicional cuando el efecto final…

HONORABLE JUEZ:

Pero mi pregunta es, dentro de esta situación, en otro caso, ¿declaró en ese otro caso? ¿Usted declaró en ese otro caso?[10]

TESTIGO, SR. FREDDIE CANCEL GONZÁLEZ:

No. Llevo como tres casos mal contados, cuatro casos que, o sea, no declaro, porque ya yo le he informado con mi abogado, que habían fiscales que yo no, sabe, que no se iba a dar el acuerdo ya. Hace como dos semanas, tres semanas, me bajaron con un, un caso que no declaré.[11]

HONORABLE JUEZ:

Bueno, it is what it is. **Se declara ha lugar la petición sobre testigo no disponible. No le voy a imponer un desacato, no voy a llover sobre mojado**. Él tiene una situación particular por la cual está indicando que no va a declarar. Y a eso redunda en cuanto al acuerdo que haya llegado el estado con él. Y nada, ¿Cuál es la otra petición?

FISCAL JOSÉ H. AROCHO SOTO:

La petición, Su señoría, sería que de conformidad a la Regla 806 de Evidencia, ya le hemos pedido, verdad, que lo determine testigo no disponible de, de conformidad a la Regla 806 de Evidencia, inciso B. Ya usted, el Tribunal ha hecho esa determinación. Ahora sería la súplica que se active el inciso B, el inciso 1 del inciso B, y es que, pues, "cuando la persona declarante no está disponible como testigo, es admisible con excepción a la regla de exclusión de prueba de referencia" uno; "testimonio anterior, testimonio dado como testigo en otra vista de el mismo, con otro procedimiento en una deposición tomada conforme a derecho durante el mismo u otro procedimiento, ello, si la parte contra quien se ofrece ahora el testimonio tuvo la oportunidad y motivo similar para desarrollar el testimonio e interrogatorio directo, contrainterrogatorio o en redirecto".[12]

En este caso, Su Señoría, el señor Freddie Cancel González declaró en la etapa de vista preliminar; en esa etapa estuvo representado por el compañero, el licenciado Rafael Ramírez. El compañero tuvo la oportunidad de contrainterrogar a ese testigo, a Freddie. Por lo que las súplicas que le hacemos, Su Senoría, es que se sustituya el testimonio del señor

---

[10] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 91.

[11] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 92.

[12] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 92 (énfasis suplido).

Freddie Cancel González, en el acto del juicio por el testimonio anterior que vertió en vista preliminar, el cual fue objeto de una vista preliminar.

La súplica es que se, verdad, que el Tribunal active el proceso para que las damas y caballeros del jurado puedan escuchar el testimonio de Freddie Cancel González en la etapa de la vista preliminar.[13]

HONORABLE JUEZ:
Licenciado.

LCDO. RAFAEL RAMÍREZ VALENTÍN:

**Hago un recordatorio que el quantum de prueba en vista preliminar, no es el mismo de juicio. El compañero le asiste la razón lo único que solicitaremos a este Honorable Tribunal que le explique al jurado cual es la situación en lo que en derecho corresponde**.

HONORABLE JUEZ:

Ciertamente, hay que informarle al jurado la razón por la cual van a escuchar una grabación.

FISCAL JOSÉ H. AROCHO SOTO:

¿Qué razón se le daría al jurado, Juez? Porque lo que quiero es, todavía tengo al testigo, y quiero saber qué tipo de….

LCDO. RAFAEL RAMÍREZ VALENTÍN:

Que no va a declarar.

HONORABLE JUEZ:

Que no quiere declarar.

LCDO. RAFAEL RAMÍREZ VALENTÍN:

Esa es la realidad, que no quiere declarar.

FISCAL JOSÉ H. AROCHO SOTO:

Que no quiere declarar, y que el Tribunal lo declaró testigo no disponible y…[14]

LCDO. RAFAEL RAMÍREZ VALENTÍN:

Claro.

HONORABLE JUEZ:

No quiere declarar. Yo no me voy a meter en los por menores de…

---

[13] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 93-94.
[14] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 94 (énfasis suplido).

FISCAL JOSÉ H. AROCHO SOTO:
Por eso.

HONORABLE JUEZ:
….por que no quiere declarar.

FISCAL JOSÉ H. AROCHO SOTO:
No, no. Vamos…

LCDO. RAFAEL RAMÍREZ VALENTÍN:

Estamos viendo eso, Juez, lo que explique no quiere declarar.

FISCAL JOSÉ H. AROCHO SOTO:
Eso era lo que yo…lo único que yo quería era eso para saber si tenía que hacer alguna otra pregunta, si era. Pero estamos conformes con que se le diga al jurado, que el testigo, pues, no está disponible, que es lo que…

LCDO. RAFAEL RAMÍREZ VALENTÍN:
No quiere declarar. Que se niega a declarar.

HONORABLE JUEZ:
No puede decir…Si el testigo está o no está disponible, es que esa definición que dice en la regla porque…[15]

FISCAL JOSÉ H. AROCHO SOTO:
No tengo problema, Su Señoría, en que se le instruya al jurado que el testigo no quiere declarar. Y a pesar de que hemos insistido se niega a declarar. Y ahora mismo es un testigo que no está disponible.[16]

Conforme hemos reseñado en los acápites anteriores, la prueba de referencia se define como una declaración hecha fuera del juicio o vista, que se presenta para probar la verdad de lo aseverado 32 LPRA Ap. VI, R. 801. Como regla general, este tipo de prueba no es admisible, salvo que la ley disponga lo contrario. 32 LPRA Ap. VI, R. 804. Sin embargo, la Regla 806 de Evidencia codifica una serie de excepciones a esta norma, siempre que el testigo o declarante no esté disponible. 32 LPRA Ap. VI, R. 806. En particular, se considera que un testigo no está disponible cuando se niega a testificar sobre el asunto de su declaración, incluso después de haber recibido una orden del Tribunal. Íd. En este sentido, solo se admitirá como prueba la declaración de un testigo no disponible si el Ministerio Público ha realizado todas las gestiones razonables para garantizar su

---

[15] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, págs. 95-96.
[16] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 96.

comparecencia. Aun así, el Gobierno no está obligado a continuar insistiendo cuando es evidente que el testigo no comparecerá o se niega a declarar.

Por su parte, la Regla 104 de las de Evidencia establece que para que proceda una objeción, la misma debe ser oportuna, específica y correcta. 32 LPRA Ap. VI, R. 104. La objeción se considera oportuna cuando se presenta en el momento mismo en que surge el fundamento para objetar o inmediatamente después. Pueblo v. Ortiz Colon, 207 DPR 100, 114 (2021). Esta debe ser precisa y detallada con el fin de invocar su fundamento, para que el juez pueda aquilatar la corrección de la objeción. Íd.

Tal y como surge de las porciones citadas de la transcripción de la prueba oral (TPO), en el caso de marras, la representación legal del Apelante no formuló objeción alguna respecto para que se declara como testigo no disponible al señor Cancel González y se permitiera presentar su testimonio ofrecido durante la vista preliminar del caso. Todo lo contrario, expresó que el Ministerio Público actuó dentro del marco normativo correspondiente al solicitar que se declarara como testigo no disponible. Dicha omisión resulta determinante, pues nuestro ordenamiento jurídico exige que las partes formulen oportunamente y de manera clara cualquier objeción que entiendan procedentes, a fin de que el Tribunal pueda resolverla en el momento adecuado. En virtud de ello, el señor Torres Ruiz no puede pretender ahora que revisemos un supuesto error que no cuestionó en el momento procesal oportuno, esto es, durante la continuación del juicio celebrado el 23 de diciembre de 2023.

Por último, aun si la objeción se hubiera planteado en tiempo y adecuadamente, el argumento seguiría siendo improcedente, puesto que el Ministerio Público no está obligado a insistir en la obtención del testimonio cuando el testigo reiteradamente manifiesta su negativa a declarar. Su deber se limita a garantizar la comparecencia de los testigos de cargo y asegurar que sus testimonios se rindan conforme a las normas

procesales, respetando el debido proceso de ley del acusado. En otras palabras, el fiscal a cargo del caso no tenía la obligación de realizar esfuerzos infructuosos para obligar al testigo a declarar. Según se pudo apreciar anteriormente, lo cierto es que el testigo se negó a prestar su declaración, a pesar de la insistencia del Tribunal y del Estado. En consecuencia, la solicitud de revisión carece de fundamento, toda vez que el propio Apelante, a través de su representación legal, validó la actuación que ahora pretende impugnar.

Aclarado lo anterior, pasemos a discutir los señalamientos de error números 9 y 10. Dado su estrecha relación, los mismos serán discutidos de manera conjunta. En resumen, el Apelante argumenta que el TPI incidió al permitir que se presentara prueba al jurado de sus arrestos y convicciones pasadas y que el Ministerio Público en su informe final argumentara sobre ello. Veamos.

Surge del expediente ante nuestra consideración que el 24 de enero de 2024 se reprodujo la grabación de la vista preliminar celebrada el 17 de mayo de 2022 donde el señor Cancel González testificó bajo juramento lo siguiente:

> HONORABLE FISCAL JOSÉ H. AROCHO SOTO:
>
> Si usted conoce a Fernando Manuel Torres Ruiz lo conocemos por Manuel y por "M".
>
> TESTIGO, SR. FREDDIE CANCEL GONZÁLEZ:
> Sí.
>
> POR EL HONORABLE FISCAL JOSÉ H. AROCHO SOTO:
>
> P "Sí". ¿Cómo usted lo conoce a él?
> R Por Manuel
> P ¿Cómo?
> R Por Manuel o "M".
> P o "M". ¿Dónde se encuentra Manuel o "M" en la tarde de hoy?
> R Aquí, él está allí.
> P Que conste, Su señoría, que señala e identifica al señor imputado.
> R Sí, correcto.
> **P Mire, ¿Qué pasó con Manuel o con "M" para el 2010? Que usted tenga conocimiento.**
> **R Se lo llevaron en un indictment federal.**
> **P ¿Se lo llevaron?**
> **R Un indictment federal.**

**P ¿En un indictment?**
**R Federal.**

LCDO. RAFAEL RAMÍREZ VALENTÍN:

Tenemos objeción, [ininteligible] de su propio y personal conocimiento.

HONORABLE FISCAL JOSÉ H. AROCHO SOTO:
Lo que pasa, Juez, es que si usted se fija, horita el compañero abogado le hizo una serie de preguntas al agente que iban dirigidas a…. Que conste que el testigo tomó, o sea, Manuel, conocido por "M", y vamos en esa línea.

HONORABLE JUEZ:
Se permite.

LCDO. RAFAEL RAMÍREZ VALENTÍN:
El que tiene que sentar las bases primero es él.

HONORABLE JUEZ:
Se permite [Ininteligible].

POR EL HONORABLE FISCAL JOSÉ H. AROCHO SOTO:
P ¿Por qué usted sabe que para el 2010 al señor Manuel o "M" se lo llevaron en un indictment federal?
R Se lo llevaron [Ininteligible].

LCDO. RAFAEL RAMÍREZ VALENTÍN:
No, Juez eso no es responsivo.

HONORABLE JUEZ:
Es que yo no lo escuché.

TESTIGO, SR. FREDDIE CANCEL GONZÁLEZ:
Que a mi tío también se lo llevaron en ese indictment.
                              […]
**P Mire, ¿Y cuál…? ¿Y qué pasó con Manuel del 2010 en adelante, con relación al indictment federal ese que se lo llevan?**
**R Estuvo preso y después salió.**
P ¿Estuvo preso cuánto…?

                              […]

P Bien. Va a ser bien breve. Mire, del 2010, ¿él estuvo preso cuánto tiempo, según usted?
R Como 4 o 5 años.[17]

Respecto a dichas expresiones, el juez que presidió los procedimientos le indicó lo siguiente al jurado:

Antes de que continuemos. Sí, le voy a dar esta instrucción al jurado. El hecho de que el testigo haya declarado que estuvo preso, esta persona, equis cantidad de años no es un hecho que hace más o menos probables los

---
[17] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero de 2024, pág.18-21 (énfasis suplido).

hechos de este caso. Eso, pues, se está mencionando para propósitos de un conocimiento que tiene el testigo sobre esta persona. Pero esto no hace…no es traído para probar los hechos que están alegados en la acusación, y ustedes no pueden tomar ese hecho para levanta algún tipo de que es una persona que es más o menos propenso a estos hechos. ¿Estamos?[18]

Por su parte, del expediente también se desprende que, en su argumentación final, el Fiscal José H. Arocho Soto manifestó lo siguiente:

[…] ¿Y qué hizo el agente Rafael Mercado? Pues el agente Rafael Mercado advino en conocimiento de que **José Manuel, que estaba en una probatoria federal** llamó a su social le informó que tenía información relacionada a un asesinato, y luego de eso fue el día 11 de enero de 2018, tres días después de los hechos al Residencial El Carmen, al edificio 34, apartamento 368.[19]

[…]

**Mientras Manuel estuvo preso en la federal**, Freddie estaba guerreando en la calle, y a los 16 años, a los 16 años -yo tengo un hijo de 23 que está estudiando medicina- a los 16 años, ustedes pueden imaginarse un joven de 16 años que ya está entrando, buscando problemas; entrándose a tiros con la gente, y lo quería matar.[20]

Tal y como hemos adelantado, los informes finales tienen como objetivo orientar al jurado sobre las inferencias que se pueden extraer de la evidencia presentada durante el juicio. Pueblo v. Fournier, *supra*, pág. 407. Por consiguiente, tanto el fiscal como la defensa tienen la libertad de comentar sobre la evidencia y de desarrollar conclusiones, inferencias y argumentos basados en ella, incluso si estos son improbables, ilógicos o erróneos. Pueblo v. Suarez Fernández, *supra*, pág. 851.

No obstante lo anterior, esta amplia libertad en los argumentos no debe transformarse en conducta abusiva. Íd.  Es decir, no se debe incitar o alimentar las pasiones o prejuicios del jurado mediante: (1) referencia a evidencia inadmisible, (2) la exhortación a hacer inferencias sin base en la prueba admitida, (3) la solicitud de que ignore la evidencia presentada, (4) la petición de que no pese la evidencia como prescribe la ley, (5) la invocación de prejuicios raciales o económicos, (6) la mención de que el

---

[18] Véase, Transcripción de la prueba oral de la vista del 24 de enero de 2024, pág. 24.
[19] *Véase*, Transcripción de la prueba oral de la vista del 22 de febrero de 2024, pág. 40 (énfasis suplido).
[20] *Véase*, Transcripción de la prueba oral de la vista del 22 de febrero de 2024, pág. 46 (énfasis suplido).

acusado se negó a testificar. Íd. Por último, solo procederá la revocación del veredicto cuando se pruebe que los comentarios del fiscal ocasionaron un perjuicio sustancial a los derechos del acusado.

Por su parte, como regla general, la existencia de un error en la admisión o exclusión de evidencia no implica la revocación de la resolución o sentencia dictada. Pueblo v. Santos Santos, *supra*, pág. 727. Es decir, el tribunal no dejará sin efecto una determinación a menos que la parte haya cumplido con los requisitos de objeción, fundamento u oferta que establece la Regla 104 de las de Evidencia, *supra* y que la evidencia admitida o excluida fue un factor decisivo o sustancial en la sentencia emitida. 32 LPRA Ap VI, R. 105.

Luego de analizar cuidadosamente las declaraciones realizadas por el fiscal José H. Arocho Soto, hemos determinado que sus comentarios no fueron impertinentes, inflamatorios ni carecieron de fundamento en la evidencia presentada. En otras palabras, las intervenciones del fiscal se ajustaron a la prueba admitida en el juicio, sin incurrir en tácticas que pudieran provocar emociones indebidas en el jurado o basarse en información irrelevante. Nótese que este hizo referencia a las convicciones pasadas del señor Torres Ruiz, únicamente con el propósito de relatar como el agente Mercado dio con el paradero del Apelante y de informar al jurado sobre la razón por la cual el testigo tenía conocimiento del señor Torres Ruiz. No se desprende que dichas referencias tuvieron la intención de influir indebidamente en la percepción del jurado respecto a la comisión de los delitos en cuestión. En otras palabras, las manifestaciones del fiscal José H. Arocho Soto se mantuvieron dentro de los parámetros que previenen la conducta abusiva y no excedieron las restricciones aplicables a los argumentos permitidos durante el informe al jurado.

Por otro lado, es preciso destacar que la única razón por la cual se permitió que el señor González Cancel manifestará que el Apelante había sido objeto de un *indictment* federal y que permaneció privado de su libertad por varios años fue con el propósito de informar al Tribunal sobre

la forma en que dicho testigo conoció al señor Torres Ruiz. En ningún momento dicha admisión tuvo como finalidad influir en el jurado para que considerara que dicha condena incrementaba la probabilidad de que el Apelante hubiera cometido los delitos imputados.

Asimismo, aun en el supuesto de que la admisión de dicha información constituyera un error, este no tuvo una incidencia determinante en el resultado del caso. Es decir, incluso si se aceptara la existencia de un error, este no alcanzaría el umbral necesario para ser considerado perjudicial, sino que, por el contrario, debe calificarse como un *harmless error*, ya que su ausencia no habría alterado el desenlace del presente caso. Por tales razones, no se cometieron los errores señalados.

Resuelto lo anterior, pasemos a discutir los restantes señalamientos de error esgrimidos. Los errores número 1, 2, 3 y 11 se encuentran íntimamente relacionados, por lo que también se discutirán en conjunto. Específicamente, el señor Torres Ruiz plantea que el foro *a quo* erró al emitir un fallo de culpabilidad por infracciones al Artículo 93 del Código Penal, *supra*, y a los Artículos 5.04 y 5.15 de la Ley de Armas, *supra*, ya que la presunción de su inocencia no fue derrotada y no se establecieron los elementos de los referidos delitos más allá de duda razonable. Además, alega que el TPI erró al declarar "No Ha Lugar" la petición de absolución perentoria que él interpuso. No le asiste la razón. Veamos por qué.

Para facilitar la comprensión de nuestro análisis, procedemos a resumir la prueba testifical pertinente que tuvo ante sí el foro sentenciador.

**(1) Agente Juan Carlos Troche Torres**

El agente Juan Carlos Troche Torres (en adelante, el "Agt. Troche Torres") es agente investigador de la Policía de Puerto Rico y pertenece a la División de Servicios Técnicos.[21] Este testificó que tomó múltiples fotografías del crimen sucedido el día 8 de enero de 2018.[22] Declaró que primero se dirigió a la Sala de Emergencias del Hospital Centro Médico de Mayagüez, donde se encontraba el Sr. José Galarza Ruiz (en adelante, el

---

[21] *Véase*, Transcripción de la prueba oral de la vista del 22 de enero de 2024, pág. 43.
[22] *Véase*, Transcripción de la prueba oral de la vista del 22 de enero de 2024, pág. 55.

"señor Galarza Ruiz") y capturó un total de 69 fotografías.[23] Expresó que el señor Galarza Ruiz tenía impactos de balas en distintas áreas de su cuerpo, incluyendo la espalda, glúteo, parte posterior de la cabeza, cuello, barbilla y piernas.[24] Señaló que el vehículo en el que había sido transportado el señor Galarza Ruiz tenía las ventanas abajo y la llave colocada en el área de encendido.[25] Indicó, además, que el vehículo fue completamente sellado con cinta adhesiva en todas sus partes y trasladado en grúa hasta la comandancia de Mayagüez.[26]

También declaró que, tras finalizar su labor en el Hospital Centro Médico de Mayagüez, se dirigió al Residencial El Carmen para tomar otro conjunto de fotografías, específicamente entre los edificios 18 y 22, frente al edificio 17.[27] Detalló que en el Residencial tomó 142 fotografías, incluyendo imágenes del cuerpo sin vida de Casiano Caraballo y del área acordonada para preservar la escena.[28] Además, mencionó que este último, presentaba múltiples orificios de bala, entre ellos en el abdomen y el muslo.[29]

### (2) Agente Richard Padilla Lisboa

El agente Richard Padilla Lisboa (en adelante, el "Agt. Padilla Lisboa") es operador de Grúas en transportación de la Policía de Puerto Rico.[30] Testificó que el 8 de enero de 2018, como consecuencia de una llamada telefónica al 911, llegó alrededor de las 3:46 p.m. al Residencial El Carmen.[31] Declaró que observó un cuerpo en el pavimento con múltiples impactos de balas, el cual fue identificado como Casiano Caraballo.[32] Aclaró que no vio ningún otro cuerpo en el lugar.[33] Expresó

---

[23] *Véase*, Transcripción de la prueba oral de la vista del 22 de enero de 2024, pág. 57.
[24] *Véase*, Transcripción de la prueba oral de la vista del 22 de enero de 2024, págs. 61-64.
[25] *Véase*, Transcripción de la prueba oral de la vista del 22 de enero de 2024, pág. 68.
[26] *Véase*, Transcripción de la prueba oral de la vista del 22 de enero de 2024, pág. 69.
[27] *Véase*, Transcripción de la prueba oral de la vista del 22 de enero de 2024, pág. 72.
[28] *Véase*, Transcripción de la prueba oral de la vista del 22 de enero de 2024, págs. 73-74.
[29] *Véase*, Transcripción de la prueba oral de la vista del 22 de enero de 2024, págs. 78-80.
[30] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 9.
[31] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, págs. 10-13.
[32] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 15.
[33] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 15.

que, al llegar, intentó recopilar la mayor cantidad de información posible pero que muchos de los presentes no quisieron hablar.[34] También indicó que vigiló la escena hasta la llegada de los agentes correspondientes y el fiscal encargado.[35] Añadió que cuando llegó, ya alguien había colocado una manta sobre el cuerpo de Casiano Caraballo.[36] Por último, testificó que, al día siguiente, redactó un Informe de Incidente en el cual relató todo lo que observó e investigó el día anterior.[37]

### (3) Betliz Caraballo Pagán

La Sra. Betliz Caraballo Pagan (en adelante, la "señora Caraballo Pagán"), madre de Casiano Caraballo, testificó que para el 8 de enero de 2018 residía en el barrio París del Municipio de Mayagüez junto a sus tres hijos.[38] Declaró que Casiano Caraballo tenía 21 años de edad y vivía alternando entre su hogar y la casa de una joven que conoció en el Residencial El Carmen.[39] Explicó que la relación entre su hijo y la joven no era saludable, lo que llevaba a Casiano Caraballo a dormir en ambos lugares.[40]

Señaló que Casiano Caraballo trabajaba en refrigeración, pero también estaba involucrado en actividades ilegales, específicamente vendiendo drogas en el Residencial El Carmen.[41] Declaró que el 8 de enero de 2018 su hijo la visitó, le informó que iba a comprar algo, salió acompañado de un amigo, y luego ella se fue a trabajar.[42] Expresó que alrededor de las 3:40 p.m., el papá de sus hijos la buscó para explicarle que había ocurrido una emergencia: su hijo había sido asesinado.[43] Indicó que no pudo llegar hasta donde estaba el cuerpo de su hijo porque tenía que buscar a sus otros dos hijos, razón por la cual fue el padre quien se

---

[34] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 16.
[35] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 16.
[36] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 23.
[37] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 25.
[38] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 58.
[39] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 59.
[40] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 59.
[41] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 60.
[42] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, págs. 64-65.
[43] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, págs. 61-65.

dirigió al Residencial El Carmen y reconoció el cadáver Casiano Caraballo.[44] Finalmente, declaró que Jorge Vigo, un amigo de Casiano Caraballo, había crecido junto a él en el barrio Broadway en Mayagüez.[45] Igualmente, mencionó que para la fecha de los hechos, Jorge Vigo vivía en Estados Unidos y estaba involucrado en el mundo del crimen, dedicándose a la venta de drogas.[46]

**(4) Freddie Cancel González, cuyo testimonio que resumimos a continuación es aquel presentado durante la vista preliminar, puesto que se determinó que éste era un testigo no disponible, al amparo de la Regla 806 de las de Evidencia 32 LPRA Ap. VI, R. 806**

El Sr. Freddie Cancel González, (en adelante, el "señor Cancel González") testificó tener 23 años de edad y haber cursado hasta el séptimo grado.[47] Expresó conocer al señor Torres Ruiz, a quien identifica como "Manuel o "M".[48] Declaró que, para el año 2010, el señor Torres Ruiz fue arrestado como parte de un *indictment* federal, junto con su tío.[49] Señaló que el señor Torres Ruiz estuvo encarcelado entre cuatro (4) y cinco (5) años.[50]

Asimismo, manifestó que, al salir de prisión, el señor Torres Ruiz, residía en un caserío, concretamente en el Residencial El Carmen.[51] Asimismo, afirmó que Evelyn, tía del señor Torres Ruiz, se dedicaba a la compra y venta de latas.[52] El señor Cancel González testificó que, mientras el señor Torres Ruiz cumplía su condena, él también se encontraba en la cárcel y señaló que durante ese tiempo el Residencial estaba en guerra.[53]

---

[44] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, pág. 66.
[45] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, págs. 68-72.
[46] *Véase*, Transcripción de la prueba oral de la vista del 23 de enero de 2024, págs. 73-74.
[47] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 18.
[48] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 19.
[49] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, págs. 19 y 20.
[50] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 22.
[51] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 22.
[52] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, págs. 24 y 25.
[53] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 25.

En relación con su propio historial, testificó que, en el año 2016 fue arrestado por un asesinato ocurrido en un centro vocacional, el cual afirmó haber cometido en defensa propia.[54] Señaló que recibió una condena de tres (3) años y seis (6) meses por la posesión del arma utilizada en la comisión del delito.[55] Indicó que salió de prisión el 5 de mayo de 2020.[56]

Expresó que conoce a Sony Bryan Zapata Cardona (en adelante, "Zapata Cardona") porque crecieron juntos en un residencial.[57] Declaró que, cuando salió de la cárcel, Zapata Cardona era el líder principal "bichote" de los Residenciales Candelaria, El Carmen y el Kennedy.[58] De igual manera, explicó que, tras su liberación, se reunió con Zapata Cardona para dialogar ya que él había hecho "tiempo" por ese caserío y deseaba establecer su posición.[59] El señor Cancel González expresó que hablaron específicamente para dividir el control de los caseríos y que acordaron que él se quedaría con Candelaria mientras que Zapata Cardona mantendría el control de su propia área.[60]

Testificó que antes de Zapata Cardona, el líder del Residencial Candelaria era Bryan Segarra.[61] Añadió que, para ese entonces, solía pasar tiempo con el señor Torres Ruiz y Zapata Cardona en las tiendas, especialmente en la tienda del Residencial llamada "Good Looking".[62] También comentó que iban a la joyería a comprar prendas y que los tres siempre estaban armados en el caserío.[63] Expresó que el control de los Residenciales El Carmen y El Kennedy estaba en manos de Sony y que el señor Torres Ruiz vendía drogas para ambos.[64]

---

[54] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 26.
[55] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 26.
[56] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 27.
[57] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 27.
[58] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 27.
[59] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, págs. 28 y 29.
[60] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 31.
[61] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 31
[62] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 32.
[63] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, págs. 32 y 33.
[64] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, págs. 33 y 34.

Afirmó conocer al señor Galarza Ruiz, quien residía en el Residencial El Carmen y era primo del señor Torres Ruiz.[65] Señaló que conocía a Casiano Caraballo porque solía frecuentar los residenciales Candelaria, Roosevelt y Yágüez y era amigo de Jorge Vigo.[66] Indicó que éste se dedicaba a la venta de drogas y corría caballos.[67] Aseguró que Jorge Vigo era un buen amigo suyo que vivía en Orlando y se dedicaba a "gatillar", es decir, a matar personas.[68] Destacó que Jorge Vigo vendía drogas, enviaba rifles a Puerto Rico y proporcionaba vehículos.[69] Además, indicó que Jorge Vigo era muy cercano a Casiano Caraballo.[70] Detalló que, tras el asesinato de Casiano Caraballo, Jorge Vigo quería vengar su muerte y planificaba matar al señor Torres Ruiz.[71] Afirmó que había una mala relación entre el señor Torres Ruiz y Jorge Vigo y recordó que, en una charla bajo un árbol del Residencial, el señor Torres Ruiz le confesó haber sido el responsable del asesinato de Casiano Caraballo.[72] En detalle, declaró lo siguiente:

> R Nada. Días después estábamos allí en el palito, donde siempre nos pasábamos, y le dije a el que hablara [Ininteligible] que dejara sus problemas con Jorge Vigo, y el me dijo Ah..yo no tenía problemas con él me dijo: "Yo no tengo problemas con él" El tenía problemas conmigo, es el que me quiere matar por la muerte de "Yomi" porque John quien mato a "Yomi", que era Manuel. Y el me empezó a contar que paso un carro duro en el caserío. Un familiar del Colo por poco se lleva y Yomar salió con cosas a la persona que estaba en el carro esmanda y que sacó la pistola y le disparó. Que Manuel estaba en Colombus y lo llamaron y le dijeron que habían matado al "Colo". Que bajó al caserío y Yomar tiró pal piso y se quedó sin balas. Que le robó la vuelta a Yomar y que le tiró.
> P Cuando usted dice "que le tiró", ¿Qué fue lo que hizo?
> P "Que lo mató.
> P "Que lo mató". Y después que lo mató, ¿Qué, si algo, le contó que hizo?[73]

[65] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 34.
[66] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 35.
[67] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 35.
[68] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, págs. 35 y 36.
[69] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 37.
[70] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 38.
[71] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, págs. 38 y 39.
[72] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 42.
[73] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 42.

R Nada, me dijo que entonces que se tuvo que esconder porque Jorge Vigo vino a Puerto Rico al caserío con más gente, que él estaba solo.[74]

De igual manera, testificó que Jorge Vigo quería matar al señor Torres Ruiz.[75] Expresó que luego de la confesión del Apelante, comenzó a tener problemas con Zapata Cardona.[76] Indicó que, para el mes de junio y julio de 2020, lo cogieron con una pistola y le pusieron un grillete.[77] Testificó que, el Día de Madres, mientras él estaba en su casa junto a su familia y con un grillete por el caso bajo la Ley de Armas, varias personas del Residencial Columbus le "tirotearon" la casa y él se quitó el grillete para no poner en peligro a su familia.[78] Señaló que el señor Torres Ruiz estaba en el Residencial El Kennedy cuando eso sucedió.[79] Expresó que, tras ese suceso, acordó con el Apelante que si los enemigos de él entraban al caserío, el señor Torres Ruiz les iba a "tirar".[80] Sin embargo, relató que luego de acordar lo anterior, asesinaron a uno de sus amigos y que al llamar al Apelante, este le respondió lo siguiente: "Mala mía".[81] Expresó que desde ese momento, el Apelante y él estaban en guerra.[82] Aclaró que quería asesinar al señor Torres Ruiz porque él estaba en el caserío cuando mataron a su amigo.[83] Expresó que un día estaba en el Municipio de Rincón y le informaron que el Apelante estaba en el caserío en chanclas, en pantalones cortos y sin camisa y que se dirigió hasta allá, pero cuando llegó ya él no estaba.[84] A preguntas de la defensa, explicó que para enero de 2018 se encontraba encarcelado, que salió el 5 de mayo de 2020 y que ingresó nuevamente a la cárcel el 9 de julio de 2021.[85]

**(5) Dr. Francisco Cortés Rodríguez**

---

[74] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 43.
[75] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 44.
[76] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 44.
[77] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 45.
[78] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 46.
[79] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 46.
[80] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 47.
[81] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 47.
[82] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 47.
[83] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 48.
[84] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 49.
[85] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 63.

El Dr. Francisco Cortés Rodríguez (en adelante, el "Dr. Cortés Rodríguez es patólogo forense del Instituto de Ciencias Forenses de Puerto Rico.[86] Éste testificó que realizó dos certificaciones de muerte el 14 de septiembre de 2021, específicamente de los cuerpos de Casiano Caraballo y Galarza Ruiz.[87] Declaró que realizó el informe médico forense de Galarza Ruiz y que este presentaba 14 heridas de bala.[88] Con relación a las heridas de bala que recibió Galarza Ruiz, expresó lo siguiente:

> R Yo lo tengo bien resumido aquí. En el número 73, José Eliezer presentaba perforaciones del corazón… una perforación del corazón, tres perforaciones en el pulmón izquierdo, más contusiones, que son golpes que recibe el órgano al chocar probablemente contra la columna o contras las costillas. Una herida de bala en el hígado, una afectando el riñón izquierdo. La aorta fue perforada, así como el estómago. Estos son los danos directos por las heridas de bala en el cuerpo.[89]

En consonancia con lo anterior, el Dr. Cortés Rodríguez aclaró que la causa de la muerte Galarza Ruíz fue homicidio.[90] Indicó que no se recuperaron proyectiles de su cuerpo.[91] Testificó que también se encargó de realizar el informe médico forense de Casiano Caraballo.[92] Respecto al examen externo de este, expresó lo siguiente:

> R. Sí. Este es el cadáver de un hombre de la raza blanca [Ininteligible] que aparenta tener la edad de 21 años. Estaba vestido con un pantalón corto deportivo, negro con gris y blanco o un boxer negro, tenis blanco y medias amarillas con negro. Una vez removida la ropa se aprecia un cuerpo que mide sesenta y nueve pulgadas de estatura y tiene un peso de 178 libras. Desaparecida la rigidez cadavérica y las livideces dependientes de … están presentes en la parte dependiente del cuerpo. La cabeza es de configuración normal. El pelo es negro, ojos color marrón. Las pupilas están igual, sin dilatación media. Tiene bigote, pero no… pero tiene…. No tiene bigote, pero tiene barba en el mentón. Posee un tatuaje en la cara anterior del tercio inferior del antebrazo derecho con el nombre "Ángel". Se observa una abrasión, como unos guallazos, rasguños, en la cara anterior de la mitad superior del antebrazo derecho, en la parte de arriba y una abrasión en la región escapular izquierda y en el hombro derecho, aquí y acá, parte superior izquierda de la espalda e incluyendo [Ininteligible].[93]

---

[86] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 113.
[87] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 120.
[88] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 125.
[89] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 127.
[90] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 135.
[91] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 135.
[92] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 136.
[93] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 137 y 138.

Finalmente, expresó que el cuerpo de Casiano Caraballo presentaba veinte (20) heridas de bala en diferentes partes del cuerpo y que al igual que Galarza Ruiz, la causa de muerte fue por heridas de bala y la manera homicidio.[94] También manifestó que se recuperaron tres proyectiles en su cuerpo, una en el tórax y dos en la extremidad superior derecha, los cuales fueron referidos a la división de balística del Instituto de Ciencias Forenses.[95]

### (6) Carmen Suliveras Ortiz

La Sra. Carmen Suliveras es examinadora de armas de fuego del Instituto de Ciencias Forenses de Puerto Rico.[96] Ésta testificó que le fueron entregados tres proyectiles relacionados al presente caso provenientes de la Sala de Autopsia. [97] Señaló que en total le entregaron 21 proyectiles y 29 casquillos para ser examinados.[98] Específicamente, indicó lo siguiente:

> P Y le pregunto, en la descripción de esas piezas de evidencia, ¿qué fue lo que se entregó allí?
> R En la primera descripción, que tiene como número de pieza la 06, se entregaron dieciséis proyectiles de KIP, o sus derivados, en la pieza número 7 se entregaron quince casquillos de bala, en la pieza número 8 catorce casquillos de bala, y en la pieza anterior, los quince casquillos de bala son 9 milímetros, y en la pieza 08, que son catorce, son calibre 40.
> P "Calibre 40".
> R Además de eso, se recibió un proyectil, que el número de pieza es la 5.
> P Okey. ¿Y de dónde se recolectó esa pieza de evidencia, según el documento?
> R Según se desprende del documento, esa pieza 05 fue recuperada del área del estacionamiento de Sala de Emergencia del Hospital Centro Médico de Mayagüez.
> P Y con relación a los dieciséis proyectiles o derivados, los quince casquillos de 9 milímetros y los catorce calibre 40 del documento, ¿fueron recolectados en dónde?
> R Además de los dieciséis proyectiles, se desprende del documento que fueron recolectados del Residencial El Carmen, entre los edificios 18 y 2, en Mayagüez. [99]

---

[94] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 144.
[95] *Véase*, Transcripción de la prueba oral de la vista del 24 de enero del 2024, pág. 144 y 145.
[96] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 8.
[97] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 18.
[98] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 18.
[99] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 23 y 24.

De igual manera, aclaró que no se sometió ningún arma de fuego, por lo que no analizó ningún tipo de herramienta.[100] Testificó que el 5 de diciembre de 2022 realizó un certificado de examen respecto a los hallazgos de las piezas evidenciarias que le fueron entregadas.[101] De dicha evaluación declaró lo siguiente:

> P Mire, Carmen, en resumen, usted evaluó dieciséis…usted evaluó, verdad, según el documento, quince casquillos de bala disparados. La pregunta que yo le hago es, de acuerdo al resultado esos quince casquillos de bala que fueron recuperados en la escena y fueron llevados por el agente Rafael Mercado, esos quince casquillos de bala, ¿cuál era el calibre?
> R Esos quince casquillos de bala son calibre 9 milímetros.
> P Y le pregunto, de acuerdo al examen que usted hizo, si en su opinión, ¿esos quince casquillos fueron disparados por la misma arma de fuego?
> R Esa es la conclusión. Esos quince casquillos que son calibre 9 milímetros. Sin lugar a dudas, fueron disparados por una misma arma de fuego.
> P O sea, fueron disparados por una pistola. ¿De qué calibre?
> R Nueve milímetros.
> P "Nueve milímetros. Okey. Mire, y los tres proyectiles que fueron recuperados en la autopsia, ¿el calibre de esos tres casqui… de esos tres proyectiles era… fue cuál?
> R Nueve milímetros.
> P "Nueve milímetros" Y le pregunto, esos tres proyectiles que fueron recuperados del cuerpo de Edgar Yomar Casiano Caraballo, le pregunto, en su opinión, si fueron disparados por la misma arma de fuego.
> R Sin lugar a dudas, fueron disparados por la misma arma de fuego.
> P Yendo a los catorce casquillos de bala calibre 40, le pregunto, verdad, en resumen y en palabras sencillas si, ¿esos catorce casquillos de bala, en su opinión pericial, fueron, son calibre 40?
> R Son calibre 40.
> P Y si fueron disparados por la misma arma de fuego.
> R Fueron, sin lugar a dudas, disparados por la misma arma de fuego.
> P y el proyectil que se recuperó en Sala de Emergencia, le pregunto, de acuerdo a su opinión pericial, ¿ese proyectil es calibre qué?
> R Cuarenta.
> P "Cuarenta". Y ese proyectil calibre 40, usted determinó que habían unos proyectiles que eran calibre 40 y calibre 9 milímetro que fueron recuperados en la escena. ¿Cómo compara ese proyectil que fue recuperado en el estacionamiento de la Sala de Emergencia con los proyectiles que usted evaluó de la escena, que eran .40?
> R De los proyectiles que eran… que fueron evaluados y son. 40 el proyectil que está recuperado en el área de sala de autopsia, perdón, de Sala de Emergencia del Hospital de Centro Médico, ese proyectil con los calibres 40 que se recuperaron en la escena tienen un mismo origen. Lo que

---

[100] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 29.
[101] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 32 y 33.

quiere decir que fueron disparados por una misma arma de fuego, calibre .40.[102]

**(7) Agente Rafael Mercado Ruiz**

El agente Rafael Mercado Ruiz (en adelante el "Agt. Mercado Ruiz") es agente investigador de la Policía de Puerto Rico y pertenece a la División de Homicidios de Mayagüez.[103] Declaró que, para el 8 de enero de 2018 se encontraba trabajando en el horario de 8:00 a.m. a 5:00 p.m.[104] Indicó que, estando en la oficina, a eso de las 3:15 p.m. a 3:20 p.m., se recibió una llamada relacionada a un tiroteo en el Residencial El Carmen.[105] Como consecuencia de ello, expresó que recibió instrucciones de su supervisor para encargarse de la investigación del caso.[106]

Testificó que primero se dirigió al Centro Médico de Mayagüez a investigar el caso.[107] Expresó que, al llegar se percató de un vehículo que estaba estacionado virado y que sus compañeros de servicios técnicos ya se encontraban allí.[108] Destacó que en el área cercana a la puerta del vehículo había un fragmento de un proyectil de bala disparado calibre .40 que había caído en el piso.[109] Manifestó que el vehículo estaba cerrado y que a plena vista se veía el asiento del pasajero con manchas de sangre.[110] Indicó que, como parte de su trabajo investigativo, ocupó el carro y verificó el cuerpo de Galarza Ruiz, el cual tenía tres impactos de bala.[111]

Asimismo, el Agt. Mercado Ruiz testificó que, luego de haber realizado su labor en el Hospital Centro Médico de Mayagüez, acudió directamente al Residencial El Carmen.[112] Expresó que el Agt. Padilla Lisboa ya se encontraba en la escena, la cual estaba acordonada.[113] Indicó que observó el cuerpo de Casiano Caraballo tirado en el pavimento,

---

[102] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, págs. 42-44.
[103] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 47.
[104] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 49.
[105] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 49.
[106] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 50.
[107] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 50.
[108] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 50 y 51.
[109] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 51.
[110] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 51.
[111] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 53.
[112] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 73.
[113] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 84.

múltiples casquillos de bala disparados, plomos, proyectiles, fragmentos de proyectiles y huellas de neumáticos.[114] Aclaró que los Residenciales Kennedy, El Carmen y Candelaria se encuentran juntos.[115] Expresó que el arma que se utilizó para dar muerte a Casiano Caraballo era de nueve milímetros mientras que el arma utilizada para asesinar a Galarza Ruiz era de .40 milímetros.[116]

Declaró que realizó el formulario de investigación y manejo de escenas criminales del presente caso donde plasmó los datos relacionados a la querella que se estaba investigando.[117] Señaló que hubo cuatro (4) llamadas al Negociado de Sistema de Emergencias 911, específicamente a las 3:09 p.m., 3:10 p.m., 3: 21 p.m. y 3:23 p.m. y que él llegó al lugar de los hechos a las 5:15 p.m.[118] Manifestó que el cuerpo de Casiano Caraballo presentaba veinticuatro (24) heridas de proyectil.[119] Testificó que luego de trabajar en la escena, procedió a entrevistar a los padres de Casiano Caraballo y a su novia, la joven Nicole Dessiré López Rivera.[120]

Del mismo modo, afirmó que, conforme a su investigación, Casiano Caraballo asesinó a Galarza Ruiz utilizando una pistola 9 milímetros y Torres Ruiz era el sospechoso de matar a Casiano Caraballo.[121] Expresó que le brindaron información relacionada al Apelante y que dos días después del asesinato, específicamente, el 11 de enero de 2018 fue al Residencial Columbus Landing para citarlo para el 13 de enero de 2018, pero él no se encontraba allí.[122] Señaló que el señor Torres Ruiz no estaba disponible en esa fecha, por lo que fue citado para el 17 de enero del 2018, fecha en la que se le leyeron las advertencias legales correspondientes.[123]

---

[114] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 85 y 98.
[115] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 87.
[116] *Véase*, Transcripción de la prueba oral de la vista del 25 de enero del 2024, pág. 92.
[117] *Véase*, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, pág. 9.
[118] *Véase*, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, pág. 10 y 11.
[119] *Véase*, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, pág. 19.
[120] *Véase*, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, pág. 19.
[121] *Véase*, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, pág. 21 y 22.
[122] *Véase*, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, págs. 27 y 31.
[123] *Véase*, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, pág. 40.

En esta misma línea, el Agt. Mercado Ruiz declaró que el 10 de agosto de 2021 entrevistó en la Comandancia de Mayagüez al señor Cancel González, quien se encontraba confinado.[124] En específico, declaró que el señor Cancel González le contó lo siguiente:

> R El narrativo, lo que el me… lo que el señor Freddie me dijo a mí fue: "Cuando Sali de la cárcel, en mayo 2020, estaba en el área de los palitos, el punto en el Residencial El Carmen, estaba allí, Manuel, le dicen M, y empezamos hablar y me contó que un familiar de el se iba a llevar a un chamaquito enredado en un carro, y que Yomi, Yomar, le salió con cosas al familiar, y ahí el, Colo, le reclamó, y Yomi sacó una pistola y le disparó. Y Manuel me dijo me dijo que el estaba en Columbus, y que escucho los disparos, y que alguien lo llamo y le dijo que habían matado al Colo, su primo. Y el bajo para el caserío. Y que Manuel se encontró a Yomi, y ya el, Yomi, no tenía más balas, y Manuel le metió, disparó. Después Manuel estuvo escondido porque Jorge Vigo viajó a Puerto Rico, porque el era amigo de Yomi, iba a vengar la muerte; Jorge Vigo me dijo -que si lo veía a Manuel que lo matara-. Y un día me estaba quedando en Rincón, y una persona me lo ubicó en el negocio del Cano, de Cano, estaba sin camisa y en chanclas, pero cuando llegue ya se había ido-". Y abajo tiene la firma de él.[125]

En lo concerniente a su investigación, arribó a las siguientes conclusiones:

> P Mire, le pregunto, de su investigación, ¿Quién mato a Colo?
> R ¿A Colo?, Edgar Yomar.
> P ¿Y que quedaba Colo de Fernando? De acuerdo a su investigación.
> R Primo.
> P Mire, y el motivo de la muerte de Yomi, ¿Cuál es?
> R La venganza. Porque Yomi mato a…[126]

Finalmente, manifestó que, tras recibir la información proporcionada por Cancel González, se contactó con el fiscal para coordinar una fecha con el propósito de llevarlo a la fiscalía de Mayagüez.[127] Explicó que, estando en la fiscalía, se le tomó una declaración jurada al señor Cancel González.[128] Posteriormente, señaló que se realizó una nueva citación al señor Torres Ruiz; sin embargo, al no ser localizado, los delitos fueron radicados en ausencia.[129]

---

[124] *Véase*, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, pág. 43 y 58.

[125] *Véase*, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, pág. 59.

[126] Véase, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, pág. 60.

[127] Véase, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, pág. 63.

[128] Véase, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, pág. 65.

[129] Véase, Transcripción de la prueba oral de la vista del 21 de febrero de 2024, págs. 75-76.

Resumida la prueba testifical que tuvo ante sí el juzgador de los hechos, pasemos a evaluarla a la luz del derecho aplicable.

Conforme hemos adelantado, es norma constitucional conocida en nuestra jurisdicción que un acusado en un procedimiento criminal goza de una presunción de inocencia. Const. PR, Art. II, Sec. 11, 1 LPRA. Asimismo, nuestras Reglas de Procedimiento Criminal establecen que los acusados se presumirán inocentes, mientras no se pruebe lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. 34 LPRA Ap. II, R. 110. Así pues, es responsabilidad del Ministerio Público presentar evidencia y cumplir con el peso probatorio para demostrar, sin dejar lugar a dudas razonables, todos los elementos del delito, la intención criminal y la conexión de la persona acusada con los hechos. Pueblo v. Santiago *et al.*, *supra*, pág. 142.

Por su parte, los tribunales apelativos no debemos intervenir con la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos del foro primario a no ser que hayan incurrido en pasión, perjuicio, parcialidad o error manifiesto al desempeñar sus funciones. Pueblo v. Negrón Ramírez, *supra*. Así pues, debemos concederles gran deferencia a las determinaciones de hechos realizadas por los juzgadores de instancia, así como a las adjudicaciones de credibilidad que éstos hacen sobre los testigos que declaran ante ellos. Íd., pág. 18. Esto se debe a que el Juez y el Jurado están en la mejor posición para aquilatar la prueba testifical, dado que tienen la oportunidad de oír, ver y apreciar el comportamiento de los testigos. Pueblo v. Hernández Doble, *supra*, pág. 864.

Luego de evaluar el expediente ante nuestra consideración, con especial atención a la TPO de los testimonios vertidos en el juicio, estamos convencidos de que la prueba presentada por el Ministerio Público estableció, más allá de toda duda razonable, todos los elementos del delito imputado al Apelante, así como su intención criminal y su conexión con los hechos. Nótese, pues, que se estableció que el 8 de enero de 2018

Casiano Caraballo y Galarza Ruiz fueron asesinados en el residencial El Carmen. De igual forma, la prueba demostró que ese día, Galarza Ruiz, quien era primo del Apelante, conducía a alta velocidad por el mencionado lugar cuando recibió múltiples disparos por parte de Casiano Caraballo. Asimismo, se demostró que, tras dicho homicidio el señor Torres Ruiz se dirigió al caserío y asesinó a Casiano Caraballo en señal de venganza.

Asimismo, el señor Cancel González testificó, bajo juramento, que el señor Torres Ruiz le confesó haber asesinado a Casiano Caraballo como acto de venganza por la muerte de su primo. El hecho de que el señor Cancel González no haya presenciado directamente el crimen no implica que su testimonio, prestado bajo juramento, carezca de veracidad. En este sentido, dicha circunstancia no constituye fundamento para alterar el fallo condenatorio. A nuestro juicio, no estamos ante cuadro en el que debemos sustituir el valor adjudicado al testimonio del señor Cancel González que le dio el TPI y, por tanto, entendemos como adecuada su versión para respaldar la condena recaída en contra del señor Torres Ruiz. Además del testimonio del señor Cancel González, resulta menester destacar que el agente encargado de la investigación, el Agt. Mercado Ruiz, tras realizar un análisis riguroso de la evidencia disponible, concluyó que Casiano Caraballo asesinó a Galarza Ruiz con una pistola de 9 milímetros, mientras que Torres Ruiz dio muerte a Casiano Caraballo utilizando un arma de .40 milímetros. Por consiguiente, los testimonios vertidos en juicio fueron suficientes para probar más allá de toda duda razonable todos los elementos del delito de asesinato en primer grado y portación y uso de armas de fuego, la intención criminal del señor Torres Ruiz y su vinculación con los sucesos del caso. La prueba de cargo demostró los hechos en controversia, de los cuales, se puede deducir razonablemente la comisión de los delitos en cuestión.

En fin, no hemos hallado indicador alguno que nos obligue a no concederle gran deferencia a las determinaciones de hechos realizadas por el juzgador de instancia, así como a las adjudicaciones de credibilidad que

éste efectuó sobre los testigos que declararon ante sí. Pueblo v. Negrón Ramírez, *supra*, pág. 18. Fue el distinguido juzgador de hechos que tuvo la oportunidad de oír, ver y apreciar el comportamiento de los testigos. Íd., pág. 16. Tampoco surge del análisis de la prueba que hubiera mediado pasión, prejuicio o parcialidad o algún error manifiesto llevado a cabo por el TPI. Al examinar la prueba, notamos que la misma concuerda con la realidad fáctica de lo ocurrido el día de los hechos. Es decir, entendemos que, a la luz de la prueba admitida, no existe base suficiente que apoye la contención del señor Torres Ruiz en su recurso, a los efectos de que el Ministerio Público no logró establecer su culpabilidad más allá de toda duda razonable, que no tuvo un juicio justo e imparcial y que procedía la absolución perentoria de los delitos por los que fue acusado. Más aún cuando el acto de aquilatar y apreciar la prueba está investido con "la alta dignidad de la magistratura en la función juzgadora de la conducta de los hombres, y no es para echarse a un lado con liviandad e indiferencia". Pueblo v. Figueroa Rosa, *supra*, pág. 159. Así pues, al adoptar esta determinación, no tenemos inquietud ni insatisfacción en nuestra conciencia respecto a la prueba presentada. Procede, por tanto, sostener el dictamen apelado.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, se *confirma* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones